IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>LUIS CRUZ-GONZALEZ,<br><br>Defendant. | CRIMINAL ACTION<br>NO. 23-293 |

# OPINION

**Slomsky, J.** **August 21, 2026**

## I. INTRODUCTION

Before the Court is Defendant Luis Cruz-Gonzalez's ("Defendant") request for the Court to sentence him below the 10-year mandatory minimum sentence applicable to Counts One, Four, and Five of the Superseding Indictment because he asserts that the Government engaged in sentencing entrapment and sentencing factor manipulation in his case to raise the minimum sentence to at least ten (10) years' imprisonment.[1] As discussed more fully below, because neither

[1] Counts One, Four, and Five relate to Defendant's drug trafficking activities involving a conspiracy and distribution and possession with intent to distribute methamphetamine. The 10-year mandatory minimum is required by 21 U.S.C. § 84, which states in relevant part:

(a) Unlawful acts. Except as authorized by this title, it shall be unlawful for any person knowingly or intentionally—

(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance; or

…

(b) Penalties. Except as otherwise provided in section 409, 418, 419, or 420 [21 USCS § 849, 859, 860, or 861], any person who violates subsection (a) of this section shall be sentenced as follows:

(1) (A) In the case of a violation of subsection (a) of this section involving—

…

sentencing entrapment nor sentencing factor manipulation has been established here by Defendant, he must be sentenced to at least the 10-year mandatory minimum on Counts One, Four, and Five.[2]

## II. BACKGROUND

### A. Factual Background[3]

In April 2022, the Drug Enforcement Administration("DEA"), Homeland Security Investigations ("HSI"), and the United States Postal Inspection Service ("USPIS") began a joint investigation of Defendant. (Doc. No. 108 at 2.)

---

> (viii) 50 grams or more of methamphetamine, its salts, isomers, and salts of its isomers or 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers;
>
> such person shall be sentenced to a term of imprisonment which may not be less than 10 years or more than life

21 U.S.C. § 841(a)(1), (b)(1)(A)(viii). In addition, 21 U.S.C. § 846 provides, in part, that anyone who conspires to violate 21 U.S.C. § 841 shall be subject to the same penalties as those proscribed for the offense that was the object of the conspiracy.

[2] On May 26, 2026, the Court, relying on United States v. McLean, ruled that both theories could result in a sentence below the mandatory minimum. See McLean, 199 F. Supp. 3d 926, (E.D. Pa. Aug. 8, 2016) ("From this limited body of precedential authority [involving the doctrines of sentencing entrapment and sentencing factor manipulation], [the Court] [is] persuaded that the Third Circuit remains open to recognition of a rule that would allow a district court to ameliorate the harshness of a sentence, under appropriate circumstances.") (citing United States v. Sed, 601 F.3d 224, 229 (3d Cir. 2010) (addressing the issues of sentencing entrapment and sentencing factor manipulation without formally rejecting doctrine); United States v. Tykarsky, 446 F.3d 458, 476 n. 13 (3d Cir. 2006) (finding that "even if we recognized sentencing entrapment as a basis for a downward departure…the doctrine has no application here."); United States v. Raven, 39 F.3d 428, 438 (3d Cir. 1994) (observing that this Court has not yet recognized sentencing entrapment)) (further citations omitted). The elements of sentencing entrapment and sentencing factor manipulation are discussed infra.

[3] The factual background is taken from the parties' briefs (Doc. Nos. 102, 108, 109) and the transcript of the evidentiary hearing held on July 31, 2026 (Doc. No. 111).

On April 15, 2022, a DEA confidential source ("CS-1"), acting at the direction of law enforcement, began engaging in consensually recorded FaceTime calls with Defendant regarding the sale of narcotics. (Id.) CS-1 subsequently introduced a second confidential source ("CS-2") to Defendant as an individual interested in purchasing controlled substances. (Id. at 3.)

Between May 11, 2022 and October 6, 2022, agents arranged for CS-2 to make controlled purchases of narcotics from Defendant. (Doc. No. 102 at 7.) During some of these transactions, Defendant and J.A., who was charged separately and is Defendant's alleged co-conspirator, worked together to complete sales and/or obtain narcotics from sources in Puerto Rico and Mexico. (Id.)

**1. May 11, 2022 Controlled Purchase**

On May 11, 2022, Defendant returned to Philadelphia from Puerto Rico and was picked up at the Philadelphia International Airport by J.A. (Doc. No. 108 at 3.) Defendant thereafter communicated with CS-1 via FaceTime and arranged to meet in a parking lot to sell 125 grams of cocaine to CS-1. (Id.) During the meeting, CS-1 introduced CS-2 to Defendant, and Defendant and CS-2 exchanged phone numbers to arrange future drug transactions. (Id.)

The transaction itself was audio- and video-recorded. (See id., Ex. 2) (transcription of the May 11, 2022 audio recording). Subsequent HSI laboratory testing confirmed that the controlled substance purchased from Defendant by CS-1 on May 11, 2022 contained cocaine and had a net weight of approximately 123.8 grams. (Id. at 3.)

**2. June 6, 2022 Controlled Purchase**

On May 17, 2022, CS-2 called Defendant to discuss the price of one-half kilogram of cocaine. (Id.) On June 4, 2022, CS-2 left Defendant a voicemail. (Id.) Later that day, Defendant returned the call and agreed to sell CS-2 one-half kilograms of cocaine on June 6, 2022. (Id. at 5.)

On June 6, 2022, Defendants sold CS-2 approximately 501.8 grams of cocaine. (Id. at 4.) During the transaction, CS-2 asked whether Defendant could supply fentanyl. (Id.; Ex. 4A at 3–6.) Defendant said that he could obtain both fentanyl pills and kilograms of fentanyl. Defendant also stated that he was obtaining a pill press to manufacture fentanyl-laced pills. (Id.; Ex. 4A at 3–4.) CS-2 also asked whether Defendant could obtain crystal methamphetamine. Defendant responded, "I think so." (Id.; Ex. 4A at 4.)

**3. CS-2 Phone Calls Between June 7, 2022 and July 15, 2022**

On June 7, 2022, CS-2 called Defendant and told him that the cocaine was "fire" and reminded him to check prices for fentanyl and methamphetamine. (Doc. No. 108 at 4; Ex. 3 at 13.) The following day, Defendant called CS-2 and offered to sell two kilograms of cocaine. (Doc. No. 108 at 4; Ex. 3 at 15.) Later that day, CS-2 called Defendant and asked about prices for various quantities of cocaine. (Doc. No. 108 at 4.)

On June 25, 2022, Defendant called CS-2 because he had cocaine available for sale. (Id. at 5.) Later that day, CS-2 called Defendant to ask about fentanyl and methamphetamine. (Id.) Defendant stated that he had a source for crystal methamphetamine and another source for fentanyl and provided prices. (Id.) Defendant later told CS-2 that his methamphetamine source had one pound available for $1,900. (Id.) CS-2 responded that he would call Defendant back later or the next day. (Id.)

On July 6, 2022, CS-2 called Defendant to ask about prices for cocaine, methamphetamine, and fentanyl. (Id.) Defendant provided only the price for cocaine. (Id.)

On July 10, 2022, CS-2 called Defendant about fentanyl. (Id.) Defendant stated that he expected to receive one kilogram of fentanyl the following day directly from Mexico. (Id.) Sometime between July 10 and July 15, 2022, Defendant informed CS-2 that the fentanyl had

arrived. (Id.) On July 15, 2022, CS-2 requested a 10-gram sample of fentanyl, stating that if his associate approved of it, they would purchase an additional 200 grams. (Id.)

**4. July 19, 2022 Controlled Purchase**

On July 19, 2022, at approximately 12:47 p.m., CS-2 called Defendant to discuss the upcoming fentanyl transaction. (Doc. No. 108 at 5.) According to telephone toll-call analysis, approximately one minute after speaking with CS-2, Defendant called a phone number used by J.A. (Id. at 6.)

At around 1:23 p.m., agents observed J.A. carrying a black bag as he exited his vehicle and entered Defendant's residence. (Id.) Defendant arrived at the residence several minutes later, then called CS-2 and agreed to meet. (Id.)

At approximately 1:49 p.m., Defendant and J.A. left the residence in J.A.'s vehicle and drove to meet CS-2. (Id.) Defendant provided CS-2 with a white, chunky substance. (Id.) Subsequent DEA laboratory testing confirmed that the substance contained fentanyl and weighed approximately 11.37 grams. (Id.)

**5. CS-2 Phone Calls Between July 20, 2022 and October 5, 2022**

On July 20, 2022, Defendant called CS-2 to provide his new phone number because he wanted to continue to sell him drugs. (Id.; Doc. No. 111 at 61:6–12.) After CS-2 informed Defendant that his associates were satisfied with the fentanyl, CS-2 asked about the price of one-half kilogram of fentanyl, and Defendant provided the price. (Doc. No. 108 at 6.)

On July 21, 2022, Defendant called CS-2 and stated that he had fentanyl-laced pills. (Id.) CS-2 asked Defendant to bring them to their next meeting. (Id.) Defendant stated that he had sold the remainder of his kilogram of fentanyl but would obtain another kilogram within two days. (Id. at 6–7.)

On August 1, 2022, Defendant called CS-2 from Puerto Rico and stated that his friend had methamphetamine available for $4,000 per pound. (Id. at 7.) CS-2 said he needed to check with his associates. (Id.) Defendant responded, "Just call me and I'll set it up, everything. And I'll send you—I'll send my man to you…I got workers for that." (Id.)

On September 9, 2022, after Defendant's short incarceration for a matter unrelated to this case, Defendant reinitiated contact with CS-2 and stated that he was back in business, fully aware that CS-2 was interested in fentanyl and methamphetamine. (Id.; Doc. No. 111 at 62:10–25.) Defendant provided prices for cocaine, fentanyl, and methamphetamine. (Id.) On September 11, 2022, Defendant called CS-2 and stated that he had methamphetamine available for $3,200. (Id.)

Because Defendant was incarcerated again, he did not speak with CS-2 until October 4, 2022, when CS-2 called to ask about the methamphetamine. (Id.) Defendant stated that he could obtain it immediately. (Id.) Later that day, Defendant told CS-2 that he was going to obtain the methamphetamine and that the price would be the same as before. (Id.)

On October 5, 2022, Defendant called CS-2 and stated that he was with the source who could supply the methamphetamine. (Id. at 7–8.) CS-2 told Defendant to have the methamphetamine ready within a day or two. (Id. at 8.) Defendant responded, "Do [not] worry about it. I'll make it happen. I got it." (Id.)

### 6. October 6, 2022 Controlled Purchase

On October 6, 2022, CS-2 called Defendant and requested one pound of methamphetamine. Defendant replied that he could obtain it in less than an hour. (Id.) During the call, Defendant suggested sending someone else to meet CS-2, but CS-2 stated that he preferred to meet Defendant because he did not trust anyone else. (Id.) Defendant agreed and responded, "Don't worry about [it]. You know I always go by myself. You do the same." (Id.)

Later that day, at approximately 1:14 p.m., agents observed Defendant and J.A. drive to J.A.'s residence and enter empty-handed. (Id.) Approximately ten minutes later, they exited the residence, with J.A. carrying an item in his hand. (Id.) They entered J.A.'s vehicle and drove to meet CS-2. (Id.) At the hearing held on July 31, 2026, Defendant admitted to selling CS-2 the methamphetamine and working with J.A. (Doc. No. 111 at 59:16-25, 60:1–2.)

Defendant entered J.A.'s vehicle and handed CS-2 a bag with red stripes. (Doc. No. 108 at 8.) Subsequent DEA laboratory testing confirmed that the bag contained 383.4 grams of methamphetamine. (Id. at 9.)

**7. Execution of Search Warrants on October 20, 2022**

On October 17, 2022, CS-2 contacted Defendant to discuss a potential purchase of one to two kilograms of cocaine and three to five pounds of methamphetamine. (Id.) Defendant stated that he had three kilograms of cocaine available for sale and could probably obtain the methamphetamine that same day. (Id.)

On October 19, 2022, CS-2 called Defendant and arranged to purchase two kilograms of cocaine and three pounds of methamphetamine the following day. (Id.) Defendant later called CS-2 and stated that he had one kilogram of cocaine and three pounds of methamphetamine. (Id.) That evening, CS-2 called Defendant and stated that his associates also wanted one or two kilograms of fentanyl. (Id.) Defendant called CS-2 back to confirm the order because it was "a little big." (Id.)

Defendant and J.A. then drove to Camden, New Jersey, to obtain drugs from Defendant's supplier before returning to J.A.'s residence to store the drugs.[4] (Id.) At the July 31, 2026 hearing,

[4] At the hearing held on July 31, 2026, DEA Special Agent Brian Scanlon, the case agent,

Defendant testified that he never procured methamphetamine, only cocaine during that meeting and then drove directly to J.A.'s residence. (Doc. No. 111 at 66:11–25, 67:1–2.)

Next, the agents obtained search warrants for both Defendant's and J.A.'s residences. (Id.) On October 20, 2022, the agents executed both warrants. (Id.) At J.A.'s residence, agents recovered methamphetamine and cocaine. (Id.) DEA laboratory testing later confirmed that the substances contained 1,311 grams of pure methamphetamine and 1,004.1 grams of cocaine. (Id.)

**8. Post-Arrest Statements of Witness J.A.**

Following the execution of the search warrants, J.A. was arrested. (Id. at 10.) J.A. told agents that he had known Defendant for approximately two years and that Defendant purchased kilograms of cocaine from a source in Puerto Rico. (Id.) J.A. also said that Defendant was one of his sources of supply. (Id.)

J.A. further stated that, weeks before his arrest, he had traveled to Puerto Rico to visit family and, at Defendant's direction, delivered cash to an individual in Puerto Rico as payment for future shipments of cocaine to Philadelphia. (Id.) According to J.A., that individual was associated with Defendant. (Id.)

J.A. also stated that on October 19, 2022, he traveled with Defendant to Camden, New Jersey, to obtain three pounds of methamphetamine and one kilogram of cocaine from Defendant's supplier. (Id.) Defendant intended to deliver the drugs to a customer in Philadelphia. Defendant then dropped J.A. off at J.A.'s residence and instructed him to hold the drugs overnight until

---

testified. On October 19, 2022, he and his fellow agents observed Defendant exit his car and receive a bag from two unknown males on Marleton Pike in Camden, New Jersey. (Doc. No. 111 at 84:1–5.)

Defendant needed them the following day. (Id.) J.A.'s statements were corroborated by DEA surveillance.[5] (Id.)

Additionally, J.A. advised agents that he and Defendant supplemented one another's drug-trafficking activities, depending on who had drugs in his possession at the time. (Id.) These statements are further corroborated by Defendant's own sworn testimony at the hearing held on July 31, 2026:

> [Government]: You told us you wanted to sell your cocaine?
>
> [Defendant]: Correct.
>
> [Government]: And if to keep your client who were buying your cocaine happy, they asked for fentanyl. They asked for methamphetamine. You worked with who you had to work with, to keep them happy so you can keep selling your cocaine along with your co-conspirator. Am I right about that, sir?
>
> [Defendant]: Correct.

(Doc. No. 111 at 75:6–14.)

### B. Procedural Background

Because the procedural background of this case is extensive, the Court will adopt the abbreviated procedural history set forth in the Government's Supplemental Memorandum (Doc. No. 108) as follows:

---

[5] Special Agent Scanlon was questioned extensively regarding the whereabouts of the bag retrieved in Camden. Agent Scanlon testified that after Defendant and J.A. left Camden, the vehicle that they were traveling in was next seen on surveillance in the area around J.A.'s residence. (Doc. No. 111 at 86:4–7.) He further testified that both the driver and passenger exited the vehicle, retrieved a bag from the trunk, and then only one of them entered the J.A.'s residence. (Id. at 86:7–11.)

On February 25, 2026, the Government filed a Superseding Indictment against Defendant, charging him with:

- Conspiracy to distribute from at least in or about April 2022 through on or about October 2022, 50 grams or more of methamphetamine, 500 grams of more of a mixture or substance containing cocaine, and a mixture or substance containing a detectable amount of fentanyl, in violation of 21 U.S.C. § 846, 841(a)(1), (b)(1)(A), (b)(1)(B), (b)(1)(C) (Count One)[6];
- Distributing on or about June 6, 2022, 500 grams or more, that is, approximately 501.8 grams, of a mixture or substance containing cocaine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B) (Count Two);
- Distributing on or about July 19, 2022, a mixture or substance containing fentanyl, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C) (Count Three)[7];
- Distributing on or about October 6, 2022, 50 grams or more, that is, approximately 366 grams, of methamphetamine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A) (Count Four); and
- Possessing with intent to distribute, and aiding and abetting the possession with intent to distribute on or about October 20, 2022, 50 grams or more, that is, approximately 1,311 grams, of methamphetamine and 500 grams or more, that is, approximately 1,004 grams,

[6] In Count One, the Grand Jury alleges in Overt Act Four that Defendant sold CS-2 approximately 366 grams of methamphetamine on October 6, 2022 and, in Overt Act Five, that Defendant obtained approximately 1,311 grams of methamphetamine on October 20, 2022. (Doc. No. 77 at 3.)

[7] In Count One, the Grand Jury alleges in Overt Act Three that Defendant, on July 19, 2022, sold CS-2 approximately 11 grams of a mixture and substance containing a detectable amount of fentanyl. (Id.)

of a mixture or substance containing cocaine, in violation of 21 U.S.C. § 846, 841(a)(1), (b)(1)(A), (b)(1)(B) and 18 U.S.C. § 2 (Count Five).

(Doc. Nos. 77 at 1–8, 104 at 1.) These charges relate to Defendant's alleged drug trafficking activities between April 2022 and October 2022.

On May 26, 2026, Defendant entered an unconditional guilty plea to the five Count Superseding Indictment. (Doc. No. 106.) That same day, the Court directed Defendant to file supplemental memoranda regarding whether the doctrines of sentencing entrapment or sentencing factor manipulation apply to the facts of this case, and for the Government to file its response within seven (7) days. (Id.)

The parties' Supplemental Memoranda was timely filed. (Doc. Nos. 108, 109.)

## III. DISCUSSION

On July 31, 2026, an evidentiary hearing was held on Defendant's request to be sentenced below the 10-year mandatory minimum on the methamphetamine charges. Because neither sentencing entrapment nor sentencing factor manipulation has been shown by Defendant in this case, neither theory provides a basis for sentencing Defendant below the 10-year mandatory minimum for his drug trafficking activities involving methamphetamine as charged in Counts One, Four, and Five of the Superseding Indictment.[8]

---

8 Defendant testified at the evidentiary hearing held on July 31, 2026 that he only dealt in cocaine. He said he would not have sold the methamphetamine had CS-2 not repeatedly asked for it. (Doc. No. 111 at 54:18–23, 64:3–5.) The charges involving methamphetamine in Counts One, Four, and Five carry a mandatory minimum of ten (10) years incarceration. The cocaine charge in Count Two carries a five (5) year mandatory minimum, and the fentanyl charge in Count Three carries a maximum sentence up to twenty (20) years' incarceration. See 21 U.S.C. § 841(a)(1), (b)(1)(B), (b)(1)(C). The five (5) year mandatory minimum sentence on Count Two for distribution of cocaine is not being contested by Defendant. (See Doc. No. 109 at 6.)

The Third Circuit Court of Appeals has repeatedly declined to either adopt or reject either doctrine. See Sed, 601 F.3d at 229 (citing cases); see also United States v. Washington, 869 F.3d 193, 209–10 (3d Cir. 2017) (declining to adopt or reject the "sentencing-factor" manipulation doctrine); United States v. Chappelle, 591 F. App'x 71, 71–72 (3d Cir. 2015) (holding same).[9]

However, those decisions establish an important principle for resolving this case: where a defendant cannot establish the factual predicates underlying either doctrine, a court need not reach the unsettled question whether the doctrines provide a basis for sentencing relief. See United States v. Baird, No. 20-2262, 2021 WL 3612161, at *2 (3d Cir. 2021) (holding that it had "declined

---

[9] In Sed, the Third Circuit addressed the circuit split regarding the availability of these doctrines by noting as follows:

> [T]he Courts of Appeals for the First, Eighth, Ninth and Tenth Circuits have adopted sentencing entrapment and sentencing factor manipulation, but they have disagreed as to whether they are separate defenses. See United States v. Jaca–Nazario, 521 F.3d 50, 57 (1st Cir. 2008) (both are identical, valid defenses); United States v. Torres, 563 F.3d 731, 734 (8th Cir. 2009) (accepting sentencing factor manipulation); United States v. Martin, 583 F.3d 1068, 1073 (8th Cir. 2009) (accepting sentencing entrapment, as distinct from manipulation); United States v. Riewe, 165 F.3d 727, 729 (9th Cir. 1999) (treating both defenses as identical and valid); United States v. Beltran, 571 F.3d 1013, 1017–18 (10th Cir. 2009) (accepting both as identical). On the other hand, the Courts of Appeals for the Fourth, Fifth, Sixth, and District of Columbia Circuits have rejected both doctrines. See United States v. Jones, 18 F.3d 1145, 1153–54 (4th Cir. 1994); United States v. Tremelling, 43 F.3d 148, 151 (5th Cir. 1995) (rejecting sentencing factor manipulation); United States v. Snow, 309 F.3d 294, 295 (5th Cir. 2002) (rejecting sentencing entrapment); United States v. Guest, 564 F.3d 777, 781 (6th Cir. 2009); United States v. Hinds, 329 F.3d 184, 188 (D.C.Cir. 2003). Finally, the Courts of Appeals for the Seventh and Eleventh Circuits have reached mixed results. See United States v. Turner, 569 F.3d 637, 641 (7th Cir. 2009) (sentencing entrapment valid but sentencing manipulation not); United States v. Ciszkowski, 492 F.3d 1264, 1270 (11th Cir. 2007) (sentencing factor manipulation valid but sentencing entrapment not).

601 F.3d at 229–30.

to rule on the legal merits of either theory in cases where the defendant has not established the 'requisite factual predicates.'"); Sed, 601 F.3d 224, 230–31 (same).

Defendant argues that the doctrines of sentencing entrapment and sentencing factor manipulation apply to the facts of this case and, therefore, permit the Court to sentence him below the 10-year mandatory minimum on the methamphetamine charges. In support of this argument, Defendant contends that while it is "clear from the evidence" that he sold cocaine and "occasionally" fentanyl, he only became engaged in the sale of methamphetamine at the requests of the Government's confidential informant. (See Doc. No. 109 at 6.) Even assuming the Third Circuit recognized the applicability of those doctrines, Defendant cannot satisfy their factual predicates for the reasons set forth below.

**A. The Sentencing Entrapment Doctrine Does Not Apply**

The Third Circuit has defined "sentencing entrapment" as follows:

> Sentencing entrapment, under its most expansive formulation, "occurs when official conduct leads an individual otherwise indisposed to dealing in a larger quantity or different type of controlled substance to do so, and the result is a higher sentence."

Sed, 601 F.3d at 230 (quoting United States v. Martin, 583 F.3d at 1068, 1073 (8th Cir. 2009)).

Here, the record shows the opposite. Defendant was already willing and able to traffic in multiple controlled substances and large quantities before and during the investigation. After the June 6, 2022 cocaine transaction, Defendant himself stated, when asked by CS-2, that he could obtain fentanyl pills, kilogram quantities of fentanyl, and methamphetamine. He stated he was acquiring a pill press to manufacture fentanyl-laced pills, had suppliers for fentanyl and methamphetamine, reported receipt of a kilogram of fentanyl from Mexico, and confirmed he could obtain additional quantities. He also stated that he could obtain methamphetamine immediately.

Defendant further initiated and expanded on the transactions. On June 8, 2022, he offered CS-2 two kilograms of cocaine. On June 25, 2022, he called to report cocaine availability. While in Puerto Rico, he informed CS-2 that he had a methamphetamine source, said that he would "set it up," and confirmed he had "workers for that." After his incarceration on an unrelated matter, he reinitiated contact with CS-2 and stated he was "back in business," again offering to sell cocaine, fentanyl, and methamphetamine. In October, he continued coordinating large-scale drug transactions and traveled with J.A. to obtain drugs from his supplier in Camden, New Jersey.

These facts do not show that the Government pressured Defendant into engaging in new criminal conduct. Defendant was already engaged in drug trafficking. He repeatedly displayed an ability and willingness to handle increasing quantities of illicit drugs, and to obtain additional controlled substances. In similar circumstances, the Third Circuit has rejected sentencing entrapment claims where the defendant's own conduct demonstrates predisposition. See Baird, 2021 WL 3612161, at *2 (holding that defendant was not "indisposed" to engage in the relevant criminal conduct where the evidence showed his willingness to participate and his continued participation even when given opportunities to withdraw). There is also no evidence of coercion or improper inducement by CS-2 or the Government's agents. CS-2 simply requested the methamphetamine and fentanyl, and Defendant repeatedly agreed to provide them, had sources, and executed the transactions himself. See Raven, 39 F.3d at 438 (holding departure on entrapment grounds inappropriate where was a defendant was an "experienced drug courier" with a "yeoman's attitude" toward his drug venture). Thus, the Government's investigation here did not pressure Defendant into trafficking in methamphetamine—it simply revealed his willingness to supply this drug for money.

**B. The Sentencing Factor Manipulation Doctrine Does Not Apply**

Defendant's sentencing factor manipulation argument is similarly unavailing. The Third Circuit in Sed described sentencing factor manipulation as a potential due-process violation where the Government "unfairly exaggerates the defendant's sentencing range by engaging in a longer-than-needed investigation" and thereby increases the drug quantities attributable to the defendant. 601 F.3d at 231 (quoting United States v. Torres, 563 F.3d 731, 734 (8th Cir. 2009)). But the Third Circuit went on to hold that law enforcement is not required to terminate an investigation after an initial controlled purchase even if the acquisition of additional quantities would increase the potential sentence. 601 F.3d at 231; see also Baird (holding that the agents' intentional delay of the sting, even though it resulted in a greater penalty, did not itself constitute sentence manipulation). Instead, the Government may continue investigation to determine the scope of a defendant's trafficking activity, including the quantities he is willing and able to distribute. Sed, 601 F.3d at 231.

The same reasoning applies here. The Government's investigation did not pressure an unwilling seller to supply larger drug quantities; it revealed the scope of Defendant's existing trafficking operation, including his involvement with multiple suppliers, international connections, kilogram-level transactions, and an ongoing relationship with J.A. See Chappelle, 591 F. App'x at 72 ("[I]t is legitimate for police to continue to deal with someone with whom they have already engaged in illicit transactions in order to establish that person's guilt beyond a reasonable doubt or to 'probe the depth and extent of a criminal enterprise, to determine whether co-conspirators exist, and to trace the drug deeper into the distribution hierarchy.'") (citing United States v. Shephard, 4 F.3d 647, 649 (8th Cir. 1993) (further citations omitted).

In this regard, the October events are telling. On October 6, 2022, CS-2 requested one pound of methamphetamine, and Defendant delivered to him 383.4 grams of methamphetamine

that same day. On October 17, 2022, CS-2 inquired about the potential purchase of one to two kilograms of cocaine and three to five pounds of methamphetamine. Defendant stated that he had three kilograms of cocaine available for sale and could obtain the methamphetamine. On October 19, 2022, he and J.A. then traveled to Camden to obtain drugs from Defendant's supplier. J.A. later confirmed that Defendant was the intended recipient and distributor of those drugs and that Defendant and J.A. routinely supplemented each other's trafficking activities. Surveillance by agents independently corroborated J.A's account. The October 20, 2022 search recovered 1,311 grams of pure methamphetamine and 1,004.1 grams of cocaine from J.A.'s residence.

The fact that the Government could have arrested Defendant earlier does not establish sentencing factor manipulation. Sed, 601 F.3d at 231. Thus, the increasing quantities sold and seized were not artificially a product of law enforcement. They reflected Defendant's actual ability to obtain, possess, and distribute substantial quantities of different kinds of illicit drugs.

## IV. CONCLUSION

For the foregoing reasons, Defendant has not shown that he was subject to sentencing factor manipulation or sentencing entrapment. For this reason, his sentence on Counts One, Four, and Five involving the trafficking of methamphetamine cannot be less than the applicable ten (10) year mandatory minimum.